723 N.E.2d 956 (2000)
In re the Matter of C.W., a Child Alleged to be a Child in Need of Services.
Susan and Rodney Miles, Appellants-Respondents,
v.
Miami County Division of Family and Children, Appellee-Petitioner.
No. 52A02-9910-JV-696.
Court of Appeals of Indiana.
February 21, 2000.
*958 Mark A. Ryan, Kokomo, Indiana, Attorney for Appellants.
Robert A. Spahr, Peru, Indiana, Attorney for Appellee.

*957 OPINION
ROBB, Judge.
Rodney and Susan Miles (collectively referred as the "Grandparents") appeal the juvenile court's orders denying their March 17, 1998 Petition for Kinship Placement (the "1998 Petition for Kinship Placement") and dismissing their February 17, 1999 Petition for Kinship Placement (the "1999 Petition for Kinship Placement"). We affirm.

Issues
The Grandparents raise several issues for our review which we consolidate and restate as:
1. Whether the juvenile court erred when it denied the Grandparents' 1998 Petition for Kinship Placement and placed C.W. in foster care.
2. Whether the juvenile court erred when it dismissed the Grandparents' 1999 Petition for Kinship Placement because they lacked standing after C.W. was adopted by the foster parents.[1]

Facts and Procedural History
The facts most favorable to the judgment reveal that on April 23, 1997, C.W. was born to Carrie Walters ("Mother") and Jeremy Lee.[2] Shortly after C.W.'s birth, C.W. and Mother lived with Grandparents. Thereafter, C.W. resided with *959 Mother and her live-in boyfriend, Curtis Moreland.
On January 16, 1998, C.W. was hospitalized for the serious injuries she incurred while in the custody of Mother and Moreland. Subsequent medical examination revealed that C.W. suffered non-accidental trauma consistent with the diagnosis of "shaken infant syndrome." Consequently, on January 17, 1998, the Miami County Office of the Division of Family and Children (the "DFC") obtained an order from the Miami Circuit Court (the "juvenile court") ordering the emergency detention of C.W. at the hospital treating her injuries. The juvenile court also entered an order prohibiting Mother and Moreland from having contact with C.W.
On January 26, 1998, DFC filed a petition with the juvenile court alleging C.W. to be a Child in Need of Services ("CHINS"). On February 26, 1998, C.W. was released from the hospital and placed in foster care. Later, on March 5, 1998, the juvenile court lifted the no contact order with regard to mother.[3] On March 24, 1998, the Grandparents filed a motion for Kinship Placement with the juvenile court.
On April 13, 1998, Mother admitted at the CHINS fact-finding hearing in the juvenile court that C.W. was a CHINS, but denied that she caused C.W.'s injuries. On June 1, 1998, the juvenile court entered an order finding the continued placement of C.W. in foster care was "in the best interest" of the child. However, the juvenile court's order encouraged DFC to consider relocating C.W. to a suitable kinship placement.
Following the completion of the dispositional hearing on June 1, 1998, the juvenile court denied the Grandparent's 1998 Petition for Kinship Placement[4] and ordered C.W.'s continued placement in foster care. The juvenile court permitted the Grandparents supervised visitation with C.W. while she remained in foster care.
On February 17, 1999, the Grandparents' filed their second Petition for Kinship Placement and requested a hearing, which was set by the juvenile court for March 24, 1999.[5] On that date the juvenile court conducted a review hearing during which Mother testified that she could not adequately supervise and care for C.W. In addition, Mother voluntarily signed a state-approved Relinquishment of Parent-Child Relationship form at the hearing. The Grandparents again requested the juvenile court to set a hearing on their 1999 Petition for Kinship Placement, which the court scheduled for April 28, 1999. Thereafter, the juvenile court entered an order approving Mother's voluntary relinquishment of her parental rights to C.W.
On April 14, 1999, the Miami Superior Court entered an order terminating both Mother and Lee's parental rights to C.W. On that same day, DFC filed a motion to dismiss the Grandparent's 1999 Petition for Kinship Placement. On April 30, 1999, the juvenile court took DFC's motion to dismiss under advisement, and set a hearing on the 1999 Petition for Kinship Placement for May 10, 1999.
Sometime in April of 1999, C.W.'s foster parents filed an adoption petition in the Miami Circuit Court (the "adoption court"). Neither the Grandparents nor *960 their counsel were informed that an adoption petition had been filed.[6]
On May 6, 1999, an attorney for DFC[7] faxed the Grandparents' attorney a letter advising him that the adoption court had granted the Petition for Adoption of C.W. by her foster parents, and that the Grandparents' future visitation with C.W. was terminated. Later, on May 10, 1999, the Grandparents filed in juvenile court a Verified Motion for Change of Venue From the Judge, pursuant to Indiana Trial Rule 76(B), and a motion for a continuance. The juvenile court took matters under advisement and directed respective counsel to prepare memorandums.
On May 24, 1999, the Grandparents filed a motion requesting a hearing on their 1999 Petition for Kinship Placement. On June 7, 1999, the juvenile court denied the Grandparents' 1999 Petition for Kinship Placement and motion requesting a hearing on the petition, reasoning that the Grandparents no longer had standing. On June 17, 1999, the juvenile court terminated C.W.'s wardship with the state. This appeal ensued.

I. Standard of Review
Here, the trial court entered specific findings of fact and conclusions of law pursuant to Indiana Code section 31-34-19-10. When reviewing a trial court's findings of fact and conclusions of law, we engage in a two-tier standard of review. We must first determine whether the evidence supports the findings, and second, whether the findings support the judgment. Culley v. McFadden Lake Corp., 674 N.E.2d 208, 211 (Ind.Ct.App.1996). The trial court's findings and conclusions will be set-aside on appeal only if they are clearly erroneous. Id. Findings of fact are clearly erroneous if the record lacks any evidence or reasonable inferences to support them. Id. The judgment is clearly erroneous if it is unsupported by the findings of fact and conclusions which rely on those findings. Id. To determine whether the findings or judgments are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility. Gunderson v. *961 Rondinelli, 677 N.E.2d 601, 603 (Ind.Ct. App.1997). Rather, we must accept the ultimate facts as stated by the trial court if there is evidence to sustain them. Yates-Cobb v. Hays, 681 N.E.2d 729, 733 (Ind.Ct. App.1997).

II. 1998 Petition for Kinship Placement
The Grandparents contend that the juvenile court erred when it denied the Grandparents'1998 Petition for Kinship Placement and placed C.W. in foster care. We disagree.
Initially, we will outline the complex CHINS procedure as set out by Indiana statute in order to better understand the juvenile court's conclusion that it was "in the best interest" of C.W. that she be placed in foster care, and not with the Grandparents. Typically, a CHINS action begins when an intake officer of the county office of family and children has reason to believe that a child is a CHINS after conducting a preliminary inquiry. Ind. Code §§ 31-6-1-8; XX-X-X-XX; 31-6-4-8. The intake officer then sends the prosecutor or the attorney for the county department a copy of the preliminary inquiry. Ind.Code § 31-34-7-2. The individual representing the state, whether the prosecutor or the attorney for the county office of family and children, makes the determination whether or not to request authorization to file a CHINS petition. Ind.Code § 31-34-7-3. Under the CHINS statute, "[a] child is a child in need of services if before the child becomes eighteen (18) years of age: (1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian. . . ." Ind.Code § 31-34-1-2(A)(1).
However, a rebuttable presumption is raised that the child is CHINS if the state introduces evidence that the child has been injured. Ind.Code § 31-34-12-4. To ensure the child's safety, the child may be taken into custody pursuant to a court order. Ind.Code § 31-34-2-1. In addition, the court may order the emergency detention of a child at a health care facility while the child is undergoing treatment. Ind.Code § 31-32-12-1.
In addition, if a child alleged to be CHINS is taken into custody, "the court shall consider placing the child with a suitable and willing blood . . . relative . . . including a grandparent . . . before considering any other out-of-home placement." Ind.Code § 31-34-4-2(a). Before placing the child with a blood relative, the court may order the office of family and children to: 1) complete a home study of the relative's home; and 2) provide the court with recommendations. Ind.Code § 31-34-4-2(b).
If a CHINS petition is filed, the juvenile court must determine whether the child's representative, parent, guardian, or custodian, admits or denies the allegations contained in the petition. Ind.Code § 31-34-10-6. If the allegations are not admitted, the court must conduct a fact-finding hearing to determine the accuracy of the petition. Ind.Code § 31-34-10-9(b). If the allegations are admitted or found to be true, the court enters judgment that the child is a CHINS, orders a predisposition report, and schedules a dispositional hearing. Ind.Code § 31-34-11-2.
The predisposition report contains a recommendation for the care, treatment, or rehabilitation of the child. Ind.Code § 31-34-18-1. The caseworker who prepares the report is a child welfare worker of the county office of family and children. Ind. Code § 31-9-2-11. Following a CHINS adjudication, the court conducts a dispositional hearing which it may "[r]emove the child from the child's home and place the child in another home or shelter care facility. . . ." Ind.Code § 31-34-20-1(3).
In the present case, C.W. was presumed to be a CHINS because of the injuries she incurred while in the care of Mother. R. 371. Due to C.W.'s extensive injuries, C.W. was hospitalized. R. 267. Thereafter, the state obtained an Emergency Detention Order detaining C.W. in the hospital *962 which was treating the injuries. R. 273.
On May 18, 1998, DFC submitted to the juvenile court a predispositional report regarding C.W. R. 55. In the report, DFC recommended placement of C.W. at the treating hospital because of the seriousness of the child's injuries and the need for continued medical care and treatment. R. 57.
On May 19, 1998, the Court Appointed Special Advocate (the "CASA"), Teresa Petrie,[8] filed a predispositional report regarding C.W. with the juvenile court. R. 83. The CASA recommended that C.W. remain a ward of the court and continue her placement in foster care. R. 91. The CASA based her recommendation on the Grandparents' lack of motivation and patience needed for the proper care of C.W., their habit of smoking cigarettes, and the possibility that they had previous knowledge of Mother's abuse of C.W., but took no action to safeguard the child. Id.
Following the dispositional hearing, the juvenile court accepted the recommendations of both DFC and the CASA, and ordered the continued placement of C.W. in foster care. The juvenile court stated that ". . . there is no suitable kinship placement available to the court since the maternal grandmother and grandfather do not maintain a cigarette-smoke-free environment in their home and vehicles." R. 75. In addition, the juvenile court stated that "[t]he minor ward is subject to recurrent bronchitis, and the fact that both of said grandparents smoke in their home and vehicles and have not yet completed eradication of the residue of cigarette smoke from their home and vehicles constitutes a present threat to the physical health of the minor child." Id.
The evidence clearly supports the juvenile court's findings that it was "in the best interest" of C.W. that she be placed with foster parents, and not with the Grandparents. Thus, the juvenile court did act within its discretion when it denied the Grandparents' 1998 Petition for Kinship Placement.

III. 1999 Petition for Kinship Placement
The Grandparents also contend that the juvenile court erred when it denied their 1999 Petition for Kinship Placement.

A. Standing
The Grandparents argue that they had standing in the juvenile court to file the 1999 Petition for Kinship Placement even after the adoption court granted the foster parents' Petition for Adoption of C.W. We disagree.
Standing refers to the question of whether a party has an actual demonstrable injury for purposes of a lawsuit. Hammes v. Brumley, 659 N.E.2d 1021, 1029 (Ind.1995). It is a prudential limitation on the ability of individuals to seek redress in our courts. Cablevision of Chicago v. Colby Cable Corp., 417 N.E.2d 348, 352 (Ind.Ct.App.1981). Standing "may be raised at any point during the litigation and if not raised by the parties it is the duty of the reviewing court to determine the issue sua sponte." Matter of City of Fort Wayne, 178 Ind.App. 228, 381 N.E.2d 1093, 1095 (1978). The main purpose of standing is to insure that the party before the court has a substantive right to enforce the claim that is being made in the litigation. Pence v. State, 652 N.E.2d 486, 487 (Ind.1995). Standing remains an essential element in litigation which serves as a check on the exercise of judicial power by Indiana courts and thereby maintains our state constitutional scheme of separation of powers. Id. at 488. It mandates that courts act in real cases, and refrain when called upon to engage in abstract speculation. Id.
We believe that the Grandparents had standing under the 1999 Petition for Kinship Placement because the petition was filed before C.W. was adopted by the foster parents. Indiana Code section 31-34-4-2 *963 permits a CHINS court to place a child alleged to be in need of services with the child's grandparents after the child is taken into custody by the state. Thus, the Grandparents had standing to file the 1999 Petition for Kinship Placement with the juvenile court while C.W. was adjudicated a CHINS.
However, when the adoption court granted the foster parents' Petition for Adoption of C.W. on May 6, 1999, the Grandparents' right to file a Petition for Kinship Placement with the juvenile court was terminated. In order to have a private action standing, the Grandparents must demonstrate that they are the proper persons to invoke the court's power and that they will suffer a demonstrable injury from which they are seeking the court's protection. Jones v. Sullivan, 703 N.E.2d 1102, 1105-06 (Ind.Ct.App.1998). However, the Grandparents were not the proper persons to invoke the juvenile court's power because they no longer had standing under their 1999 Petition for Kinship Placement filed with the juvenile court. After C.W.'s adoption, they no longer held the status as C.W.'s grandparents. An adoption "severs the child entirely from its own family tree and engrafts it upon that of another." Matter of Adoption of Thomas, 431 N.E.2d 506, 513 (Ind.Ct.App.1982). As a result of the adoption, the adopted child becomes the legal child of the adoptive parent. In re Visitation of Menzie, 469 N.E.2d 1225, 1227 (Ind.Ct.App.1984), trans. denied. Because they were no longer C.W.'s grandparents, they had no standing to pursue the petition seeking placement of C.W. in their home. Thus, after the adoption, no effective relief could be granted to the Grandparents and it was no longer necessary to decide the question of kinship placement.

Conclusion
Based on the foregoing, we hold that the juvenile court properly denied the Grandparents' 1998 Petition for Kinship Placement, finding that it was "in the best interest" of C.W. that she be placed in foster care. In addition, we hold that the juvenile court properly denied the Grandparents' 1999 Petition for Kinship Placement because after C.W. was adopted, they no longer had standing under the petition.
Affirmed.
BROOK, J., and NAJAM, J., concur.
NOTES
[1] The Grandparents also argue that the juvenile court erred when it denied the Grandparents' Verified Request for Change of Judge, pursuant to Indiana Trial Rule 76(B), on May 10, 1999. R. 235. Because we have determined that after C.W. was adopted, the Grandparents' did not have standing under their 1999 Petition for Kinship Placement, we need not address that issue.
[2] Lee resided in California for most of C.W.'s life and throughout the disposition of this case. There is no indication from the record that he took any interest in C.W.'s upbringing or these proceedings.
[3] On March 20, 1998, the juvenile court dismissed Moreland as an interested party in the CHINS proceeding because he no longer cohabitated with Mother.
[4] The juvenile court denied the Grandparent's Petition for Kinship Placement because the Grandparents did not maintain a cigarette-smoke-free environment in their home and vehicles, which constituted a threat to the physical health of C.W. due to her recurrent bronchitis. R. 75. However, the juvenile court stated that it would entertain the refiling of the Petition for Kinship Placement by the Grandparents if they: 1) eradicated the cigarette smoke from their home and vehicles; and 2) stopped smoking. R. 76.
[5] The Grandparents refiled the Petition for Kinship Placement after they eradicated the cigarette smoke from their home and vehicles, and quit smoking.
[6] Although we give no opinion about the propriety of the procedures followed in the adoption matter since the adoption proceeding is not before this court, we note that Indiana Code section 31-19-4-10 provides that "[t]he court shall give notice of hearing and the opportunity to file objection to parents, putative fathers, other necessary parties, and interested parties that the court in the court's discretion directs." We recently held that grandparents may be "interested parties" under the statute in some circumstances, and when grandparents retain such status, the trial court has an affirmative duty to notify them of a hearing on another party's Petition for Adoption of their grandchild. See In re the Adoption of I.K.W., 724 N.E.2d 245, 250 (Ind. Ct.App. 2000). Although the competing petitions for adoption in In re the Adoption of I.K.W., were filed in the same court and the hearings on the respective petitions were set a mere thirty minutes apart from one another, we can envision a situation where competing Petitions for Adoption are filed in different counties, or as in the present case, a Petition for Adoption has been filed while a CHINS proceeding has been initiated on a child's behalf in a different court. Thus, we believe that in order for an adoption court to fulfill its duty to notify appropriate parties, it has an affirmative duty to conduct an initial inquiry to determine whether or not all of the "interested parties" have been given notice of the Petition for Adoption, and if there are any competing actions pending in other courts.
[7] We believe that DFC acted inappropriately when they did not inform the Grandparents of the Petition for Adoption of C.W. filed by the foster parents. The Grandparents attempted to maintain close ties with C.W. throughout the CHINS proceeding in the juvenile court, and took measures to increase the likelihood that the juvenile court would place C.W. in their care. Such measures included the cessation of smoking by both the Grandparents, and the eradification of smoke in both their home and vehicles. The DFC apparently did not believe that C.W. should be placed with the Grandparents, and did not inform them of the foster parent's Petition for Adoption, thereby foreclosing any chance the Grandparents may have had to contest the adoption and gain custody of C.W.
[8] Petrie was appointed the CASA for C.W. on January 22, 1998. R. 16.